UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CHRISTOPHER J. VASQUEZ,

                           Plaintiff,

           - against -

THE CITY OF NEW YORK, et al.,

                       Defendants.
----------------------------------------------------------X

**MEMORANDUM & ORDER**

11-CV-3024 (SLT) (VVP)

**TOWNES, United States District Judge:**

       After the grand jury voted not to indict him on charges of burglary and other lesser

offenses, Plaintiff Christopher J. Vasquez commenced this action pursuant to 42 U.S.C. § 1983

and state law against the City of New York (the "City") and several New York City Police

Department ("NYPD") officers (collectively, "Defendants") alleging that his rights were violated

in the course of his arrest and prosecution.  Defendants now move for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure, principally arguing that probable

cause existed for both Plaintiff's arrest and prosecution.  For the reasons set forth below,

Defendants' motion is granted in part and denied in part.


I.       **BACKGROUND**

    A.      **Facts**

       Unless otherwise indicated, the following facts are undisputed.  On January 1, 2011, at

approximately 8 a.m., Pawel Stuczyk, who lives in apartment 2R at 60-41 Palmetto Street

("Palmetto Building") in Queens, New York, called 911 to report "some noises coming from the

apartment downstairs."  (Defs. 56.1 Stmt. ¶ 5; Dep. of Pawel Stuczyk, dated Mar. 1, 2012

("Stuczyk Dep.") at 12-13).  Stuczyk testified that he heard a male voice yelling, "[t]hey raping

me.  I know you can hear me; let me out," (Stuczyk Dep. at 13), and also "something being

broken and . . . someone destroying the apartment downstairs," (Stuczyk Dep. at 83).  The owner

of the downstairs apartment, Pawel Pajda, was not present at that time in 1R.  (Defs. 56.1 Stmt. ¶

8).  Defendant Officers Michael Varecka and Michael Sciame immediately received a radio

transmission from central dispatch that directed them to respond to the Palmetto Building for an

assault in progress.  (Defs. 56.1 Stmt. ¶ 9).  They arrived several minutes after 8 a.m. and spoke

with Stuczyk, who waited outside the Palmetto Building to meet the officers.  (Defs. 56.1 Stmt. ¶

10).  Plaintiff, who did not live there, was the only other person present outside the Palmetto

Building.  (Defs. 56.1 Stmt. ¶¶ 12, 13).  Plaintiff had bruises on his face and appeared to have

been beaten up.  (Defs. 56.1 Stmt. ¶ 15).  Stuczyk did not see anyone go in or out of 1R.

(Stuczyk Dep. at 31).  Plaintiff disputes Stuczyk's testimony that he "told police and eyewitness

Sean Byrne [, a nearby resident,] that he observed plaintiff in the back of" the Palmetto Building

(where 1R is located).  (Defs. 56.1 Stmt. ¶ 20; Pl. 56.1 Counterstmt ¶ 20) (emphasis added).  In

support of his position, Plaintiff quotes the following deposition testimony from Stuczyk and

Byrne:

> Q:     When you saw [Vasquez], where were you?
> A:     I was in the front of the apartment, in front of the door pretty much.
> Q:     When you saw him, where was he?
> A:     He was coming out from between two buildings.

(Stuczyk Dep. at 15).

> Q:     What else did Pawel [Stuczyk] tell you?
> A:     He said he found him behind the building or he was on the side of the building
>        where he lives.
> Q:     Where who lives?
> A:     Where Pawel [Stuczyk] lives. I guess right over here. . . .
> Q:     So are you referring to the alleyway?
> A:     Yes, that's between two houses, the building here and the house here.

(Dep. of Sean Byrne, dated Mar. 20, 2012 ("Byrne Dep."), at 13).

Stuczyk asked the officers to check the backyard where 1R is located because he believed something had happened to that apartment. (Defs. 56.1 Stmt. ¶ 21). When Officer Varecka, Stuczyk, and Byrne, went into the back alleyway, they observed that a window to 1R was open, the blinds were in disarray and hanging out of the window, and a jacket was lying on the ground about 8 to 10 feet from the window, which contained Plaintiff's blackberry. (Defs. 56.1 Stmt. ¶¶ 22- 24; Pl. 56.1 Counterstmt. ¶¶ 22- 24). Plaintiff disputes the testimony of Officer Varecka, Stuczyk, and Byrne that they saw one set of footprints in the snow going to the back of the Palmetto Building, (Defs. 56.1 Stmt. ¶ 27), relying on his own deposition testimony that although it was snowing that day, "[a]ll the snow was packed up to the side" so there were no footprints. (Dep. of Chistopher Vasquez, dated Feb. 27, 2012 ("Vasquez Dep."), at 47). Plaintiff concedes that "damage to the interior of the rear first floor apartment was readily apparent." (Pl. 56.1 Stmt. ¶ 28). The damage included broken flower pots, glassware, computer, chairs, window, a television, and a fish tank that flooded the floor. (Defs. 56.1 Stmt. ¶ 26). Defendants rely on two lines of testimony from Officer Varecka for the proposition that Plaintiff "basically stated I went through the window." (Defs. 56.1 Stmt. ¶ 29; Varecka Dep. at 72). Plaintiff strongly disputes this statement, maintaining that he never admitted to anyone that he entered 1R. (Pl. 56.1 Counterstmt ¶ 29).

Defendants also claim that an ambulance was dispatched to the scene and that Plaintiff refused treatment. (Defs. 56.1 Stmt. ¶¶ 37-38). Plaintiff flatly denies that an ambulance was called or that he was offered treatment on the scene. (Pl. 56.1 Counterstmt. ¶¶ 37-38). For this assertion, Plaintiff relies on his own testimony as well as one statement by Byrne that he "didn't hear them call for it," when he was first speaking with the police officers. (Pl. 56.1 Counterstmt. ¶ 38 (citing Byrne Dep. at 55)). As Defendants observe, however, every witness except Plaintiff

testified that an ambulance arrived on the scene – including Byrne. (See, e.g., Byrne Dep. at 35-36; Stuczyk Dep. at 65-67; Varecka Dep. at 73-74, 82; Dep. of Michael Sciame, dated Mar. 7, 2012, at 23, 37). Additionally, the contemporaneous log indicates "EMS ONSCENE" at 8:22 a.m. (Decl. of Patrick Michael Megaro, Esq., dated Aug. 27, 2012 ("Megaro Decl."), Ex. 4 ("SPRINT Report")).

According to the call log for the incident, Officer Varecka, who was assigned the call sign "104C," arrived on the scene at 8:05-06 a.m. and at 8:32 a.m. called in: "1 UNDER ARREST AT 832 – for 104C." (SPRINT Report). Plaintiff was asked to stand up and put his hands behind his back, and was then placed in handcuffs. (Defs. 56.1 Stmt ¶ 32). Sergeant Timothy Hinteman and Officer Todd Freidrich arrived after Plaintiff was handcuffed to verify the arrest. (Defs. 56.1 Stmt. ¶ 40).

Defendants contend that "Plaintiff never complained about any injuries at any point that morning on January 1, 2011," or that the officers were hurting him when they handcuffed him. (Defs. 56.1 Stmt. ¶¶ 33, 34). Plaintiff counters that he complained repeatedly as he was being arrested and later at the precinct that the handcuffs were too tight, that they were lifting up his arms behind him "to a point where I can hear it pop," and that he said "my arm really hurts." (Pl. 56.1 Counterstmt. ¶ 33 (citing Vasquez Dep. at 98, 100, 109, 110, 129, 133, 136)). Plaintiff concedes that he had "other injuries from being assaulted prior to his arrest," but maintains that "his arm had no injuries until he was handcuffed and arrested by the Defendants." (Pl. Counterstmt. ¶¶ 35, 36). According to Plaintiff, when he went through a medical screening after arraignment, "I clearly told them I'm hurt and I need medical attention." (Vasquez Dep. at 126). On January 2, 2011, Plaintiff was sent to Bellevue Hospital Center ("Bellevue"). (Defs. 56.1 Stmt. ¶ 42). Medical records show that he suffered an "impacted radial head fracture" to his

elbow. (Decl. of Vicki B. Zgodny, dated July 30, 2012, Ex. N ("Ex. N") at NYC18). On January 3, 2011, the doctor who examined Plaintiff at Bellevue noted that "[patient] claims he was jumped and landed on the elbow. No other complaints." (Ex. N at NYC25). Physician notes from the Bellevue visit also indicate that Plaintiff was "brought here in DOC custody after an assault in street. He was walking in the street, remembers getting hit + grabbed, + woke up in an apartment. Doesn't know how long he was out for, woke up alone in an apartment, wasn't confused per se, but didn't know his location. . . . Says he has had R elbow/hand pain since the incident, can't straighten out elbow." (Ex. N at NYC14).

In contrast, Plaintiff contends that he told hospital staff that his arm was injured during the course of his arrest – though the testimony he cites is rather unclear:

> Q. Did you tell them how you sustained an injury to your arm?
> A. I told them everything that happened. As I was walking through the process, I don't remember word for word what I told them but I clearly told them everything.
> Q. Specifically with respect to your arm, did you tell them how you sustained that injury?
> A. I believe so. I think I just mentioned all, like the scuffle with whoever tried to rob me because they ask certain question. They didn't --
> Q. You told them about the scuffle and that's how you injured your arm?
> Q. I didn't tell them how I injured my arm. I told them I was in a scuffle. I told them about my head and they wanted to send me for head X-rays.
> A. Did you tell them about your arm?
> Q. I told them the scenario of what I told them. I don't know what they wrote.
> A. Did you tell them how you injured your arm?
> Q. When I was being handcuffed and everything. It did not hurt until after I was in the cell after they took the cuffs off.
> Q. How did you hurt it?
> A. The awkward position my arm was, being how short they are and nobody's arms were meant to move the way my arms were being pulled from side to side.

(Vasquez Dep. at 127-28). During a March 16, 2011, appointment with New York City Correctional Health Services, the physician noted that "pt claims that he was jumped by 3 individuals and beaten resulting in close fx of right thumb and forearm and elbow, he is

requesting to change the ace bandage for the splint in right hand."  (Decl. of Vicki B. Zgodny, dated Sept. 17, 2012, Ex. W ("Ex. W")).

Officer Varecka signed the sworn criminal complaint against Plaintiff.  (Pl. Opp. Ex. 7). In April, Stuczyk, Pajda, and Officer Varecka testified against Plaintiff before the grand jury. (Defs. 56.1 Stmt. ¶ 44).  On April 6, 2011, the grand jury voted no true bill and the charges against Plaintiff were dismissed.  (Defs. 56.1 Stmt. ¶ 46).

### B.    Procedural History

Plaintiff commenced this action on June 23, 2011.  In his amended complaint, Plaintiff alleges that he was assaulted by defendants Pajda and Stuczyk in the early morning hours of January 1, 2011, as he walked in the vicinity of Palmetto Street in Queens, New York, (Docket No. 10 ("Am. Compl.") ¶ 12), and that a number of defendant police officers thereafter placed him under arrest, "punched and kicked him repeatedly about the face and head, yanked his arms up behind him, kneed him in the back, and handcuffed him too tightly thereby cutting of[f] circulation to his hands, despite Plaintiff's broken arm and pleas for medical attention," (Am. Compl. ¶¶ 14, 15).  Plaintiff claims that he was held an entire day at the precinct without food, water, or medical treatment.  (Am. Compl. ¶ 19).  Plaintiff contends that these defendants variously violated his civil rights under § 1983 and New York law by causing him physical injury, arresting and incarcerating him without probable cause, as well as falsifying evidence, testimony, and reports, and causing him to be criminally prosecuted despite actual knowledge of Plaintiff's innocence.  (Am. Compl. ¶ 21).  Asserting fourteen separate causes of action under § 1983 and New York law, Plaintiff seeks compensatory and punitive damages.  (Am. Compl. at 17).

On March 26, 2012, Plaintiff dismissed Pajda and Stuczyk from the action,[1] leaving the

City and individual officers as Defendants.  (Docket No. 22).  On September 17, 2012,

Defendants filed their motion for summary judgment, arguing, inter alia, that:  (1) Plaintiff fails

to establish municipal liability; (2) there was probable cause to arrest and prosecute Plaintiff; (3)

Defendants are entitled to qualified immunity; and (4) Plaintiff failed to provide requisite notice

as to his state law claims.  (Docket No. 47 ("Defs. Mem.")).  In opposition, Plaintiff argues that

he has adduced sufficient evidence to prove each cause of action and that "virtually all of the

material facts of this case are sharply in dispute."  (Docket No. 52 ("Pl. Opp.") at 1).


## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

Doninger v. Niehof, 642 F.3d 334, 344 (2d Cir. 2011).  When evaluating a motion for summary

judgment, the court must construe the evidence in the light most favorable to the non-moving

party, drawing all reasonable inferences and resolving all ambiguities in his favor.  See Niagara

Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  A court's role "is not to resolve disputed issues

of fact but to assess whether there are any factual issues to be tried."  Goldberg & Connolly v.

N.Y. Cmty. Bancorp, Inc., 565 F.3d 66, 71 (2d Cir. 2009).

Initially, the movant bears the burden of demonstrating "an absence of evidence to

support an essential element of the nonmoving party's claim."  Pavel v. Plymouth Management

---

[1]     Asked why he initially named Pajda and Stuczyk as defendants, Plaintiff testified that
"[t]he way they came out the building looked like they owned it" and he saw their names on
orders of protection, so "I feel they are part of this case also."  (Vasquez Dep. at 177-78).

Group, Inc., 198 Fed. App'x 38, 40 (2nd Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  Should the movant carry this burden, the non-movant "must come forward with evidence that would be sufficient to support a jury verdict in his favor."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  The non-movant cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture."  W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotation marks omitted).  If the evidence favoring the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50, 106 (internal citations omitted).

## III.    DISCUSSION

### A.    Federal Claims

Invoking § 1983, Plaintiff appears to allege violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.[2] Section 1983 "creates no substantive rights," but provides "a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). To maintain a § 1983 action, a plaintiff must demonstrate that the conduct at issue (1) was "committed by a person acting under color of state law" and (2) "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).

---

[2]    References to the Fifth, Sixth, and Eighth Amendments change in Plaintiff's papers without explanation.  (See Am. Compl. ¶¶ 1; 2, 30; Pl. Opp. at iii, 17).

Moreover, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). A plaintiff cannot base a defendant's liability on respondeat superior or on "linkage in the . . . chain of command." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003). For a defendant who occupies a supervisory position, the Second Circuit has "construed personal involvement . . . to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright, 21 F.3d at 501).

As a preliminary matter, Plaintiff has offered no evidence or testimony in support of violations of the First, Fifth, Sixth, Eighth, or Fourteenth Amendments, so that summary judgment is granted dismissing those grounds. The Court will address Plaintiff's § 1983 claims under the Fourth Amendment.

### 1. False Arrest

A § 1983 claim for false arrest derives from the right to be free from unreasonable searches and seizures, including the right to be free from arrest absent probable cause. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). To prove a claim of false arrest, a plaintiff must show: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). The existence of probable cause gives an officer the privilege to arrest and "is a complete defense to an action for false

arrest" brought under § 1983. Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (quoting Weyant, 101 F.3d at 852).

Probable cause for an arrest requires that an officer "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012). To determine whether probable cause exists, "courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks, brackets, emphasis, and citations omitted). Courts must examine the "totality of the circumstances" and "be aware that probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002).

Typically "a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." Miloslavsky v. AES Engineering Society, 808 F. Supp. 351, 355 (S.D.N.Y.1992), aff'd, 993 F.2d 1534 (2d Cir. 1993). "[A]n identified bystander with no apparent motive to falsify . . . information . . . has a peculiar likelihood of accuracy." Caldarola, 298 F.3d at 163 (internal quotation marks omitted). Although "an officer may not disregard plainly exculpatory evidence," probable cause generally is not vitiated where "an innocent explanation may be consistent with the facts alleged," or "an officer[] fail[s] to investigate an arrestee's protestations of innocence." Panetta, 460 F.3d at 395-96. As the Second Circuit has made clear, "if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted." Curley v. Village of

Suffern, 268 F.3d 65, 70 (2d Cir. 2001).  Indeed, "probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information."  Bernard, 25 F.3d at 102.

In this case, Defendants correctly observe that "an arrest is lawful if there is probable cause for any offense . . . whether or not it is the same offense or closely related to the offense with which the arrestee is charged."  (Defs. Mem. at 6 (citing Devenpeck v. Alford, 543 U.S. 146, 153 (2004)).  For example, New York law provides in pertinent part that "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property."  N.Y. Penal L. § 140.10.  Even construing in Plaintiff's favor that he never admitted to being inside 1R, it is undisputed that Stuczyk called 911 to report noises from the apartment below his own, (Defs. 56.1 Stmt. ¶ 6); Stuczyk met the officers outside the Palmetto Building, (Defs. 56.1 Stmt. ¶ 10); Plaintiff was the only other person present outside the Palmetto Building minutes after the call, (Defs. 56.1 Stmt. ¶ 10); Stuczyk asked the arresting officer to check the back of the building because he thought something had happened in 1R, (Defs. 56.1 Stmt. ¶ 21); the arresting officer observed the apartment window was open with its blinds hanging out in disarray, (Defs. 56.1 Stmt. ¶ 23); Plaintiff's jacket, containing his phone, was lying on the ground approximately 10 feet from the window, (Defs. 56.1 Stmt. ¶ 24); and "[l]ooking inside, damage to the interior of the rear first floor apartment was readily apparent," (Pl. 56.1 Stmt. ¶ 28).  Under these circumstances, the Court finds that probable cause existed to arrest Plaintiff and his false arrest claim fails as a matter of law.

### 2.    Malicious Prosecution

To prevail on a § 1983 claim for malicious prosecution against a state actor, a plaintiff must show a violation of his rights under the Fourth Amendment and establish four elements

under New York state law: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010). Defendants do not contest the second element, as there is no question that the grand jury's dismissal of the charges arising from Plaintiff's arrest was a favorable termination. See Bowman v. City of Middletown, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000) ("[T]he proceeding against Bowman was indisputably terminated in his favor when the grand jury voted no true bill."). Defendants contend, however, that Plaintiff cannot establish any of the remaining elements.

As to the first element, Defendants argue that "the intervening independent actions of the prosecutor breaks the chain of causation between defendant police officers and the prosecution commenced against a plaintiff." (Defs. Mem. at 8). Defendants also argue that as a grand jury witness, Officer Varecka "has absolute immunity from any § 1983 claim based on the witness' testimony." (Defs. Mem. at 7-8 (citing Rehberg v. Paulk, 132 S. Ct. 1497, 1506 (2012)). These arguments are without merit here. The Second Circuit has made clear that "under New York law, if there is no indictment, a criminal action is commenced by the filing of an accusatory instrument," so that "the officers who sign a complaint and corroborating affidavit can be found to have initiated a prosecution – and therefore satisfied one of the elements of a malicious prosecution claim – as a matter of law." Jenkins v. City of NY, No. 10 Civ. 4535 (AJN), 2013 WL 870258, at *12 (S.D.N.Y. Mar. 6, 2013) (citing Cameron v. City of N.Y., 598 F.3d 50, 63, 65 (2d Cir. 2010)). Indeed, "generally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." Cameron, 598

F.3d at 63. As to the immunity argument, district courts in this circuit have found defendants'
attempts to use Rehberg to "convert grand jury testimony into an all-purpose shield from
malicious prosecution liability . . . unpersuasive" because "adoption of such a broad
interpretation . . . would allow any police officer – regardless of the extent of their involvement
in laying the groundwork for an indictment – to escape liability merely by securing an
appearance before a grand jury." Sankar v. City of New York, No. 07 CV 4726 (RJD)(SMG),
2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012); see Carr v. City of New York, No. 11 Civ.
6982 (SAS), 2013 WL 1732343, at *6 (S.D.N.Y. Apr. 19, 2013).

Nevertheless, Plaintiff's claim for malicious prosecution fails on the third element. As
the Second Circuit recently reiterated, "[o]nce probable cause to arrest has been established,
claims of malicious prosecution survive only if, between the arrest and the initiation of the
prosecution, the groundless nature of the charges is made apparent by the discovery of some
intervening fact." Smith v. Tobon, No. 12–3917–cv, 2013 WL 3368885, at *1 (2d Cir. July 8,
2013) (internal citation, quotation marks, and brackets omitted). In this case, Plaintiff has not
offered any new facts that came to Defendants' attention that would have defeated the probable
cause that existed at the time of the arrest. The only new evidence that came to light after
Plaintiff's arrest was a more detailed assessment of the damage to the apartment. Moreover,
Plaintiff's assertion that police declined to credit his version of events and that he never admitted
being inside the apartment is insufficient. See id. (noting "[t]he fact that [plaintiff] told police
that he had not participated in a drug sale does not suffice" to defeat probable cause shown at
arrest). Accordingly, summary judgment is granted as to Plaintiff's claim for malicious
prosecution.

### 3.    Malicious Abuse of Process

A § 1983 claim for malicious abuse of process is similarly analyzed under New York law, which provides that a plaintiff must show that a defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino, 331 F.3d at 76. "The crux of a malicious abuse of process claim is the collateral objective element," pursuant to which a plaintiff must prove that a defendant acted with an improper purpose, as opposed to improper motive. Douglas v. City of New York, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (citing Savino, 331 F.3d at 76). The New York Court of Appeals has included "economic harm, extortion, blackmail and retribution" as examples of collateral objectives in this context. Brandon v. City of New York, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010) (citing Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 404 (1975)).

In his amended complaint, Plaintiff merely recites that "Defendants arrested Plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process." (Am. Compl. ¶ 51). In his opposition papers, he writes there is "evidence to show that these acts were done as vengeance for a 'friend of a friend.'" (Pl. Opp. at 16). Plaintiff's sole support for this assertion is his own deposition testimony that "I don't remember which officer it was when they put the handcuffs on me, but he clearly said that the house was a friend of a friend's." (Pl. Dep. at 44-45). Plaintiff's reliance on this allegation is insufficient to defeat a motion for summary judgment as to his malicious abuse of process claim.

### 4. Excessive Force[3]

A § 1983 claim for excessive force arising from the detention or arrest of an individual derives from the Fourth Amendment right to be secure from unreasonable seizures.[4] Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006). For these claims, the Supreme Court has instructed courts to examine whether the use of force is objectively unreasonable "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. In the context of an arrest, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment, and several courts in this Circuit have required plaintiffs to allege more than a de minimis use of force to succeed on their excessive force claims." Nogbou v. Mayrose, No. 07 Civ. 3763, 2009 WL 3334805, at *6 (S.D.N.Y. Oct. 15, 2009) (citation and internal quotation marks omitted) (collecting cases). Generally, "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." Matthews v. City of New York, 889 F. Supp. 2d 418, 441 (E.D.N.Y. 2012) (collecting cases).

---

[3] Defendants correctly note that Plaintiff did not include an excessive force claim under §1983 as a separate cause of action in his amended complaint. (Defs. Mem. at 12). Yet, apart from reciting the general notice requirement, Defendants do not argue that they lacked notice of such a claim. Plaintiff's amended compliant provided facts concerning his alleged mistreatment and included state law claims for assault and battery, which are subject to the same legal standard as a federal excessive force claim. See Pierre-Antoine v. City of New York, No. 04-cv-6987, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) ("[T]he test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim.") (citations omitted). Moreover, Defendants addressed both the federal and state law claims on the merits. (Defs. Mem. at 13-16, 23).

[4] The Court notes that Plaintiff, who is represented, seeks to root his excessive force claim in the Eighth Amendment. (Pl. Opp. at 17). While "post-conviction excessive force claims . . . are properly considered under the Eighth Amendment," Bonilla v. Jaronczyk, 354 Fed. App'x 579, 581 (2d Cir. 2009), claims of excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 395 (1989).

In his amended complaint, Plaintiff alleges that the officer defendants "grabbed [him], punched and kicked him repeatedly about the face and head, yanked his arms up behind him, kneed him in the back, and handcuffed him too tightly thereby cutting of[f] circulation to his hands, despite Plaintiff's broken arm and his plea for medical attention." (Am. Compl. ¶ 15). However, Plaintiff now limits his excessive force claim to injuries to his arm: "While plaintiff did have other injuries from being assaulted prior to his arrest, his arm had no injuries until he was handcuffed and arrested by the Defendants and injured during the course of his arrest." (Pl. 56.1 Counterstmt. ¶ 35; see also Pl. Opp. at 18-19). Plaintiff has testified that Officers Varecka and Sciame handcuffed his hands behind his back, (Vasquez Dep. at 129), lifted his arm up "to a point where I can hear it pop," and "ignored all my screams" when he complained of pain, (Vasquez Dep. at 133). In contrast, Defendants contend that Plaintiff told medical personnel he landed on his elbow when he was jumped by unknown attackers, not that he was injured during his arrest. (Def. Mem. at 14-15). Defendants also argue that none of the deposed eyewitnesses testified that they saw or heard Plaintiff complain that the police officers were hurting him during his arrest. (Def. Mem. at 15-16).

The record in this case presents – at least on its face – a material factual dispute as to whether Officers Varecka and Sciame caused the documented injury to Plaintiff's arm, which would preclude summary judgment for his excessive force claim. See Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ("[A]s a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury."). To avoid this conclusion, Defendants argue that "in circumstances where the plaintiff relies almost exclusively on his own testimony, the Second Circuit has held that District Courts may . . . make assessments

about whether a reasonable jury could credit a plaintiff's testimony."  (Defs. Mem. at 15 (citing Jeffreys v. City of New York, 426 F.3d 549, 550 (2d Cir. 2005)).  Defendants assert that Plaintiff has failed to offer anything beyond his own accusations and testimony in support of his excessive force claim.  (Def. Mem. at 15-16).

"To be sure," the Second Circuit has recognized "an exception for 'the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete.'"  See Fincher, 604 F.3d at 725 (quoting Jeffreys, 426 F.3d at 554).  The Court declines to apply the exception in this case.  In Jeffreys, the plaintiff alleged in a sworn affidavit that a police officer delivered blows to his head, body and arms with a flashlight, that he lost consciousness, and that one or more of the police officers threw him out of a window.  426 F.3d at 551.  However, the record showed that Jeffreys confessed at least three times that he jumped out the window himself and that he made no mention of a beating or defenestration in his confession, arraignment, guilty plea or sentencing.  Id. at 552.  Additionally, Jeffreys was unable to provide a description of any police officers who allegedly participated in the attack, and medical personnel who examined him immediately after the fall reported that he never lost consciousness and found no evidence of head trauma.  Id. at 552-53.

In the instant case, the Court is not persuaded that Plaintiff's testimony, while often confused, is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." Id. at 551 (internal quotation marks omitted).  Moreover, there is medical evidence of the injury he alleges and the records upon which Defendants principally rely contain doctors' notes, not sworn statements from Plaintiff himself.  (See Exs. N, W).  Accordingly, although Defendants have presented substantial evidence to rebut Plaintiff's testimony, it is not the Court's role to

resolve disputed issues of fact.  Summary judgment is denied as to Plaintiff's excessive force claim.

### 5.    Qualified Immunity

"A police officer performing a discretionary function enjoys qualified immunity from an excessive force claim unless (1) she violated a constitutional right (2) that was clearly established at the time of the alleged violation."  Hodge v. City of Long Beach, 425 Fed. App'x 33, 34 (2d Cir. 2011).  Moreover, "even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful."  Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (internal bracketing omitted).

In this case, Defendants do not suggest that Plaintiff was anything but cooperative when he was arrested.  Plaintiff's narrative that police injured his arm during the arrest and that he repeatedly complained of pain, if accepted by a jury, could sustain a claim of excessive force.  Indeed, the material fact in dispute is not principally whether the force was reasonable, but whether Officers Varecka and Sciame actually caused Plaintiff's injury.  See Gonzalez v. City of New York, No. 98-CV-3084, 2000 WL 516682, at *5 (E.D.N.Y. Mar. 7, 2000) (denying summary judgment and qualified immunity on an excessive force claim because, "[a]ssuming [plaintiff's] version of events is true, no reasonable officer could believe that the abusive application of handcuffs was constitutional, given the fact that he did not resist arrest").  Defendants' motion for summary judgment on the grounds of qualified immunity therefore is denied as to the excessive force claim.

### 6. Municipal Liability

Plaintiff also asserts a § 1983 claim against the City pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), reciting that the "customs, policies, usages, practices, procedures and rules of [the City] and the [NYPD] were the direct and proximate cause of the constitutional violations suffered by Plaintiff." (Am. Compl. ¶ 56). It is well settled that "<u>Monell</u> does not provide a separate cause of action," but instead "<u>extends</u> liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original). In this case, Plaintiff's Fourth Amendment claim for excessive force against Officers Varecka and Sciame is the only alleged constitutional violation to survive summary judgment. Municipalities cannot be liable for the torts of their employees under a theory of <u>respondeat</u> <u>superior</u>. <u>Bd. of County Comm'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 403 (1997). Moreover, the Second Circuit has made clear that "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 81 (2d Cir. 2012).

In his opposition papers, Plaintiff contends that Sergeant Hinteman, who was in a position to verify the arrest, has "a track record of false arrests, unlawful and excessive use force . . . and . . . falsifying official NYPD reports," and that failure to remove him from this position amounts to the City's "turn[ing] a deliberate blind eye to these questionable police practices." (Pl. Opp. at 22). Plaintiff has submitted evidence that, prior to the instant case, eight civilian complaints were filed against Sergeant Hinteman (five alleging excessive use of force) and he was named as a defendant in two § 1983 actions settled by the City. (Pl. Opp. Ex. 20; Pl. 56.1

Stmt. ¶ 48).  Even assuming such evidence would be admissible,[5] these allegations were not

sustained and Plaintiff makes no argument that the City's investigations were somehow

inadequate.  He also offers nothing, such as affidavits from the complainants, beyond the

summary list of civilian complaints and their dispositions.  No reasonable jury could conclude on

the basis of this evidence that the City demonstrated deliberate indifference with respect to

allowing Sergeant Hinteman to hold a supervisory role.  See Thomas v. Roach, 165 F.3d 137,

145 (2d Cir. 1999) (affirming summary judgment as to municipal liability where complaints filed

against officer were either "unfounded" or "not sustained"); Talib v. Officer Garcia, No. 98-CIV-

3318 DC, 2000 WL 968772, at *6 (S.D.N.Y. July 12, 2000) (granting summary judgment on

excessive force claim as to police officer defendant against whom no civilian complaints were

sustained).

        To the extent Plaintiff premises his Monell claim on Sergeant Hinteman's acting as "a

policymaking official [when he] ordered or ratified the employee[s'] actions – either expressly or

tacitly," Jones, 691 F.3d at 81, Plaintiff offers no support for the contention that Sergeant

Hinteman qualifies as a policymaking official simply because he has authority to verify arrests.

(Pl. Opp. at 22); see, e.g., Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003)

(rejecting plaintiff's assertion that NYPD sergeant was policymaker where he had "decision-

making authority over the conduct of the officers at the scene"); Cerbelli v. City of New York,

No. 99-CV-6846 (ARR) (RML), 2008 WL 4449634, at *12 n.19 (E.D.N.Y. Oct. 1, 2008) (noting

that NYPD sergeants "do not qualify as policymakers").  Summary judgment is granted as to

---

[5]        The Second Circuit has "upheld the exclusion of evidence of prior civilian complaints
against police officers charged with use of excessive force" under Federal Rules of Evidence 403
and 404(b) where the "defendant had been largely exonerated on all of the charges."  Thompson
v. City of New York, No. 05 Civ. 3082 (PAC) (JCF), 2006 WL 298702, at *2 (S.D.N.Y. Feb. 7,
2006) (citing Berkovich v. Hicks, 922 F.2d 1018, 1022-23 (2d Cir. 1991)).

Plaintiff's municipal liability claim.  Furthermore, Sergeant Hinteman and Officer Friedrich are dismissed as defendants from the action because Plaintiff has ascribed to them no personal involvement beyond failing to remedy the alleged wrongs committed by Officers Varecka and Sciame.

**B.  State Law Claims**

Defendants argue that Plaintiff's state law causes of action for false arrest, false imprisonment, assault, battery, malicious prosecution, malicious abuse of process, intentional infliction of emotional distress, negligent hiring and retention, and negligent training and supervision must be dismissed because he failed to file a timely notice of claim on the City. (Defs. Mem. at 22).  Plaintiff concedes that he never filed a notice of claim, but argues that non-compliance is a mere "procedural defect" because his filing of the instant action allowed "more than sufficient time for Defendants to investigate Plaintiff's claims" and prepare their defense. (Pl. Opp. at 24).  These arguments are unavailing.

It is well-established that an action in tort against New York municipalities, or any of their officers, agents, or employees, requires service of a notice of claim on the municipality within ninety days after the claim arises.  See N.Y. General Municipal Law § 50-e.  Furthermore, "'[n]otice of claim requirements are strictly construed by New York state courts,' and failure to provide a notice of claim generally requires dismissal of a plaintiff's state law claims."  O'Leary v. City of New York, No. 11-CV-1578 (WFK) (RML), 2013 WL 1482733, at *5 (E.D.N.Y. Apr. 11, 2013) (quoting Hardy v. N.Y.C. Health & Hosp. Corp., 164 F.3d 789, 793-94 (2d Cir. 1999)); see Hyde v. Arresting Officer Caputo, No. 98-CV-6722, 2001 WL 521699, at *4 (E.D.N.Y. May 11, 2001) ("Under New York law, a notice of claim is a mandatory precondition

to bringing a tort claim against a municipality or any of its officers, agents or employees.").

Accordingly, summary judgment is granted as to all of Plaintiff's state law claims.


## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Docket No.

44) is granted in part and denied in part.  All claims and defendants are dismissed except for

Plaintiff's Fourth Amendment excessive force claim as against Defendant Officers Varecka and

Sciame.  Counsel for Plaintiff and Defendants Varecka and Sciame are directed to confer and by

October 16, 2013, contact the Chambers of Magistrate Judge Viktor V. Pohorelsky to schedule a

settlement conference.

**SO ORDERED.**


_____/S/_____
SANDRA L. TOWNES
United States District Judge


Dated: September 30, 2013
        Brooklyn, New York